# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTY HILL, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 CV 50306 |
| | ) | Magistrate Judge Iain D. Johnston |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christy Hill brings this action under 42 U.S.C. § 405(g), seeking reversal of the decision denying her social security benefits. As explained below, the case is remanded for further consideration.

## BACKGROUND

On November 17, 2010, plaintiff filed her disability applications alleging that she suffered from postural hypotension, vasodepressor syncope, septal infarct, non-alcoholic fatty liver disease, irritable bowel syndrome, depression, obesity (body mass index of 33.7), and gastroperesis. Dkt. #14 at 1. From 2010 until mid-2012, plaintiff saw a number of doctors, including a gastroenterologist, several cardiologists, and her regular physician. She also visited a sleep clinic. (Some of these visits are discussed more below.) In June 2011, she was interviewed by consulting psychologist Mark B. Langgut who diagnosed her with major depressive disorder (moderate) and generalized anxiety disorder. R. 677.

On June 29, 2012, a hearing was held before an administrative law judge ("ALJ"). Plaintiff, then 48 years old, testified that she graduated from high school, was 5' 7" and weighed

213 pounds, and lived in a house with two of her children, who were 16 and 17 years old. R. 31-33. When the ALJ asked why she could not work, plaintiff stated:

> Because there are times that I can't even get out of bed. I'm either extremely dizzy, and just, you know, there's not much I can do. My kids have to do the housework, sometimes; a lot of times because [with] just that physical exertion I can faint.

R. 33. She testified that she was dizzy every day: "If I'm in an upright position too long, it gets really bad." R. 39.

She testified that her stomach problems made it difficult to work because she did not know when she had to use the restroom and because she had to vomit "quite a bit." R. 34. Plaintiff also testified about her daily activities, the numerous medications she was taking, some of her doctor visits, and some of her work history. Her last job was a telemarketer selling U-verse for AT&T sometime in 2008 or 2009. R. 35-38. A vocational expert testified. No medical expert was called.

On August 31, 2012, the ALJ denied her applications. The ALJ found that plaintiff suffered from the severe impairments of history of septal infarct, postural hypotension, fatty liver disease, delayed emptying syndrome, and depression. R. 14. The ALJ found that plaintiff did not meet any listings. In the residual functional capacity ("RFC") analysis, the ALJ summarized plaintiff's doctor and hospital visits from 2010 and to 2012 and found that she could perform the full range of exertional activities except that she could not work on ladders, ropes and scaffolds; could not use heavy equipment or work at unprotected heights; could only do occasional balancing, stooping, crouching, crawling, or kneeling; and needed to do unskilled work. R. 16.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C.

§ 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, *33-34 (N.D. Ill. 2013).

Plaintiff's opening brief contains two formal arguments, intertwined with a few more half-formed arguments. All the arguments are superficial and poorly developed. As this Court has pointed out previously to counsel, this presentation makes the Court's job more difficult and raises the recurring question of whether these arguments have been waived.[1] In her first argument, plaintiff asserts that the ALJ failed to assess her maximum RFC by incorrectly finding

---

[1] The government, however, in this case has not argued that these arguments should be waived.

that she could perform the full range of work at all exertional levels, a finding plaintiff describes as being "too generalized" and "internally inconsistent." Dkt. #14 at 5. Based on the long quotation of the hearing transcript that plaintiff included in her brief, the Court infers that she is focusing mostly on her dizziness. In her second argument, she asserts that the ALJ should have called a mental health expert to testify at the hearing to reconcile Dr. Langgut's finding that she had moderate major depressive order.

Despite counsel's cursory presentation, this Court finds (based more on its own independent review of the record, which the Seventh Circuit requires) that a remand is warranted because the ALJ failed to fully explain his reasoning and rested his decision on at least one significant factual error. The Court will focus its analysis on plaintiff's postural hypotension and resulting dizziness and syncope (the medical term for fainting) allegedly caused by this condition.

To summarize the key facts, plaintiff at some point was diagnosed with postural hypotension, also known as orthostatic hypotension. According to the Mayo Clinic's website, postural hypotension "is a form of low blood pressure that happens when you stand up from sitting or lying down," and it "can make you feel dizzy or lightheaded, and maybe even faint." *See* www.mayoclinic.org/diseeases-conditions/orthostatic-hyoptension (visited July 28, 2015) (hereinafter "Mayo Clinic Website"). The original diagnosis seems to have been made by the OSF Hospital and cardiologists working there.[2] In June 2010, perhaps in conjunction with the OSF Hospital testing, plaintiff was given a tilt table test, which is used to evaluate the cause of syncope. *See* Mayo Clinic Website. Plaintiff tested positive, a result that the government acknowledges shows that plaintiff "may have experienced substantial dizziness." Dkt. # 17 at 3.

---

[2] Neither the parties nor the ALJ provided specific details about who the doctors were who conducted these tests and made these initial diagnoses.

On March 15, 2011, plaintiff was evaluated for a second opinion by Dr. Justin T. Mao, a cardiologist at Midwest Heart Specialists. R. 603. Dr. Mao found that OSF Hospital had performed a thorough review ("a pretty extensive workup") and agreed with their recommendations for medication and other treatment options. He only made a few minor tweaks and suggestions. Here is the relevant portion from his notes:

> Syncope – So far I agree with everything that has been done at OSF. They have done a pretty extensive workup including stress Echo, cath, and event monitor all of which have been unrevealing. From the tilt table test report it seems pretty indicative of neurocaridogenic syncope and her symptoms sound pretty classic. She is on all the right medications and at this point I am going to increase the florinef to .2 mg daily to see if this helps further. I also instructed her to increase her fluid intake (she only drinks about 2-3 bottles of water a day)[.] I will have her f/u with my APN in 1 month to see if there is any change. If not, I will have my APN increase her midodrine to 10mg tid.

R. 605. This paragraph was *not* quoted nor summarized in the ALJ's opinion.

Thereafter, plaintiff saw other doctors for other issues, including visits with her regular doctor. She sometimes complained about the syncope and dizziness and other times did not mention them.

The ALJ reviewed this evidence in a mostly chronological narrative interspersed with occasional commentary. Based on this commentary, the ALJ seemed to believe that plaintiff's dizziness and syncope were not serious. He generally referred to these symptoms as being "non-acute" and "episodic" and concluded that they were less frequent in the fall of 2011 than they were before, thus hinting at an improvement narrative. He stated that Dr. Mao "endorsed the [earlier] treatment options presented and identified no new sources of medical restriction," suggesting that the doctor did not find her condition serious. R. 17. The ALJ also noted that in certain doctor visits, such as one for a toothache, she did not complain about dizziness and syncope. Overall, the ALJ's comments suggest he believed plaintiff received only minor

treatment which was inconsistent with her claim that on some days the dizziness prevented her from getting out of bed. *Id.* The ALJ also stated: "In point of fact, the claimant takes no syncope or postural dizziness medication."[3] *Id.* The ALJ relied on this fact in discounting plaintiff's credibility, stating that "she is not able to provide accurate and specific detail." *Id.*

However, the Court finds that the latter factual premise—that plaintiff was taking no medications for postural hypotension—is not supported by the record. As noted above, the doctors at OSF prescribed medications for plaintiff's postural hypotension and related symptoms. Later, Dr. Mao independently concluded that plaintiff was then on "*all* the *right* medications." R. 605 (emphasis added). He identified these medications as being midodrine and florinef (also known as fludrocortisone). The Mayo Clinic website identifies these two medications as being the ones generally prescribed for postural hypotension.[4] There are other references in the record confirming that plaintiff was taking these medications. *See, e.g.,* R. 733 (list of current medications as of 8/26/11). It is true that plaintiff did not mention these two medications at the hearing, but she was testifying from memory and stated, after describing a few of her medications, that "I don't remember the rest." R. 31. This seems to be a weak basis for concluding that she was taking no dizziness or syncope medications. Thus, contrary to the ALJ's statements, there is little evidence to suggest that plaintiff was refusing to take the recommended medications. Without any medical testimony or evidence to support his belief, the ALJ seemed to believe that there were other treatments or medications that plaintiff could pursue and was not

---

[3] This conclusion seems to be based on the fact that, in her testimony at the hearing, when asked to recall what medications she was then taking, plaintiff did not mention any medications for dizziness and syncope.

[4] Specifically, the website states: "Several medications, either used alone or together, can be used to treat orthostatic hypotension. For example, the drug fludrocortisone is often used to help increase the amount of fluid in your blood, which raises blood pressure. Doctors often use the drug midodrine (ProAmatine) to raise standing blood pressure levels."

doing so. Moreover, the ALJ has failed to identify what these treatments and medications were. Dr. Mao's notes certainly give the impression that she was doing all she could do based on the known medical evidence. As for whether there were any other treatments, plaintiff testified that her doctors told her "there's really not much they can do because my blood pressure is so low, and my heart rate is so extreme." R. 43. She also stated that she had to be taken off certain medications because of her stomach problems (gastroparesis). *Id.* The ALJ never acknowledged this evidence in his opinion.

For these reasons, the Court finds that a remand is warranted. The ALJ's unsupported claim that plaintiff was taking no medications could have played a significant role not only in the ALJ's bottom-line conclusion that plaintiff's symptoms were not serious but it also could have affected the ALJ's credibility finding. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

Having found that these errors are sufficient to justify a remand, the Court will only briefly comment on other possible errors. In reviewing the ALJ's opinion alongside the medical record, the Court is concerned that the ALJ relied too much on his own review of the medical literature without having a supporting medical opinion. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (the ALJ should "rely on expert opinions instead of determining the significance of particular medical findings themselves"); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

To support his conclusions, the ALJ relied on two medical opinions. First, the ALJ referred, very briefly, to Exhibit 6F, a Physical Residual Functional Capacity Assessment form completed by Dr. Victoria Dow. R. 19, 512-519. Dr. Dow, who did not examine plaintiff, acknowledged that plaintiff reported that she could not stand for more than five minutes before she became dizzy and that she needed to sit often when cooking or shopping. R. 517. Although Dr. Dow found that these statements were partially credible, she then included *no* exertional limitations. In particular, in answering the question on how long plaintiff could stand on the job, Dr. Dow included no limitations. R. 513. This means that she concluded that plaintiff could stand for the entire eight hours of a normal work day, as the question contains possible answers such as standing for less than two hours in an eight-hour day, standing at least two hours, or standing about six hours. The stark difference between plaintiff's assertion that she could not stand for more than five minutes and Dr. Dow's opinion that plaintiff could stand for the entire eight hours at least requires further explanation. Dr. Dow did not include any explanation on this form, and it is difficult for this Court to interpret what she meant by stating that plaintiff was *partially* credible. The ALJ did not analyze any details in this report.

Second, the ALJ also briefly referred to a report from Dr. Zoiopoulos. Here is the ALJ's entire analysis: "One cardiologist, [Lynn Zoiopoulos], M.D., expressly declined or omitted correlating these symptoms with inability to work (1F/6), which would tend to imply that the claimant retains substantial measures of work capacity despite a small septal infarction and a history of vasodepressor syncope, otherwise referred to as postural hypotension." R. 18. Dr. Zoiopoulos completed a form entitled Cardiac Report (Ex. 1F). The ALJ cited to page 6 of this report, thus indicating that it was the doctor's answer to question 15 that the ALJ was relying on. However, this question, which contains two parts, was left blank, raising a question as to what

the doctor's silence was meant to convey. The first part asked the doctor to describe any "serious limitations" in the plaintiff's ability to do daily activities of living.  The second part asked the doctor to describe the patient's ability to do work-related activities such as standing.  If the doctor's failure to answer the first part suggests by negative implication that she believed plaintiff had no serious limitations, then this same approach would mean that the doctor also believed that plaintiff had *no ability* to do *any* work-related activity. In short, these are contradictory, making it hard to extract any clear opinion from this one question on a form filled out by a non-examining doctor. Moreover, on this same form, Dr. Zoiopoulos answered "yes" to whether plaintiff had "Syncope" and "Near syncope (lightheadedness)." R. 241

In light of this sparse medical opinion testimony, the Court encourages the ALJ on remand to call an impartial medical expert, who could help on a number of levels.  For one thing, an expert could provide more background on the medical terms and how the symptoms relate to each other.  As one example, it was unclear to the Court what the relationship was between dizziness and syncope.  At various points, the ALJ noted that plaintiff reported having one but not the other. Was this significant?  Did the diagnoses depend on plaintiff having both symptoms?

A related but important point is the frequency of these symptoms. The ALJ believed it was telling that plaintiff's symptoms were "episodic" and "non-acute." But the ALJ never explained what he specifically meant by these phrases or whether they were findings inconsistent with postural hypotension. Why would it matter if the condition was merely chronic and not acute? The ALJ also did not pinpoint, or even given a range as to, the frequency of the symptoms.  Do these symptoms typically wax and wane such that it would not be unusual for them not to be present on some doctor visits for other issues? Were there other treatments

available that plaintiff was not pursuing, as the ALJ seems to suggest? An expert could help provide a baseline and context. If there was not much else that could be done, then this might cast a different light on why plaintiff was not going to the doctor as often as the ALJ believed she should be doing if her symptoms indeed were serious.[5] An expert could also help in considering whether plaintiff's postural hypotension may be related to, or exacerbated by, her other conditions such as her gastric problems, obesity (which the ALJ never analyzed), and mental health issues.

The Court finds that the above issues are enough to order a remand, and the Court will not further examine plaintiff's additional arguments for remand, none of which would individually be sufficient to justify a remand. However, the ALJ nonetheless should review all these issues again with fresh eyes. In remanding this case, the Court is not indicating any opinion on the final outcome.

## CONCLUSION

For the reasons given, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the decision of the ALJ is remanded for further consideration.

Date: July 29, 2015   By:   _____
                              Iain D. Johnston
                              United States Magistrate Judge

---

[5] *See generally*, Juan J. Figueroa, Jeffrey R. Basford, and Phillip A. Low, "Preventing and treating orthostatic hypotension: As easy as A, B, C," *Cleveland Clinic Journal of Medicine*, at p. 1 (May 2010) (located at http://www/ncbi.nlm.nih.gov/pmc/articles) ("Orthostatic hypotension is a chronic, debilitating illness that is difficult to treat.").